IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ALEXANDER APPEL,

                PLAINTIFF.

vs.

THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY POLICE OFFICERS "John Does 1-10" and NEW YORK CITY SUPERIVSING POLICE OFFICERS "Richard Roes 1-10"

                DEFENDANTS.

14 CV 7992

INDEX NO.
ECF CASE

JUDGE FAILLA

COMPLAINT
[JURY TRIAL

Plaintiff ALEXANDER APPEL, by his attorneys, STECKLOW COHEN & THOMPSON, complaining of the defendants, respectfully allege as follows:

## I. PRELIMINARY STATEMENT

1. Plaintiff ALEXANDER APPEL bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2. On October 5, 2011, a large labor rally took place in downtown Manhattan. Thousands of workers, students and other individuals joined Occupy Wall Street ("OWS") in demonstrating against Wall Street and economic inequality. This rally began in Foley Square and then continued to Zuccotti Park. Eventually, many of these participants continued the march further downtown.

3. Plaintiff ALEXANDER APPEL was present during this entire day documenting the march. Plaintiff ALEXANDER APPEL was documenting the rally and the New York Police Department's ("NYPD") response to the rally as a livestream journalist.

4. In the evening, Plaintiff ALEXANDER APPEL was documenting the march as it was near the proximity of Bridge and State Street in downtown Manhattan. While present at the aforesaid intersection, Plaintiff ALEXANDER APPEL was lawfully on a sidewalk.

5. OWS began on September 17th, 2011 and is a collection of individuals and ideas that seek, *inter alia,* to call attention to and change inequalities and ill effects created through government-driven and corporation-favoring policies and practices that engender economic inequality and prevent a vast majority of individuals from enjoying the rights, liberties, and freedoms guaranteed to them by the United States Constitution.

1

6. As Plaintiff ALEXANDER APPEL was standing on the sidewalk, in compliance with the specific instructions of the NYPD, he was tackled and brought to the ground by approximately five or more police officers, including DEFENDANT JOHN DOE POLICE OFFICRS.

7. Plaintiff ALEXANDER APPEL stated loudly, "I AM NOT RESISTING ARREST. I AM NOT RESISTING ARREST"

8. Nevertheless, Plaintiff ALEXANDER APPEL was the victim of excessive force as numerous officers punched and kicked Mr. APPEL. At least one officer used his boot to kick and stomp Mr. APPEL about his body, head and nose.

9. Four or more Defendant JOHN DOE POLICE OFFICERS then assisted the arresting officer in pinning Plaintiff ALEXANDER APPEL to the ground, using profane language, and applying two sets of plastic flex-cuffs to Plaintiff ALEXANDER APPEL's wrists tightly so that he lost feeling in his hands.

10. DEFENDANT JOHN DOE POLICE OFFICERS knocked the glasses off of the Plaintiff's face, and then destroyed his glasses.

11. The Plaintiff ALEXANDER APPEL complained about the tightness of the cuffs, and eventually they were removed and reapplied.

12. One or more of the Defendant POLICE OFFICERS also punched Plaintiff ALEXANDER APPEL and applied a knee to Plaintiff ALEXANDER APPEL face, neck and back. At or around this time, one or more of the Defendant "John Doe" POLICE OFFICERS present encouraged the physical violence rendered against Plaintiff ALEXANDER APPEL by exclaiming comments such as, "stop resisting," even though Plaintiff was not resisting

13. Plaintiff ALEXANDER APPEL was arrested and falsely charged with the offense of Disorderly Conduct.

14. In sum, Plaintiff ALEXANDER APPEL brings this claim as a quest for answers as to why —— despite the fact that he was at all times compliant with the law and individual Defendants' orders —— New York City Police Officers sworn to serve and protect him instead harassed him, brutalized him, and caused him to suffer significant and painful injuries seemingly due only to his activities as a citizen journalist, and/or his mere proximity to an Occupy Wall Street event.

## II. JURISDICTION

15. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

16. Plaintiff ALEXANDER APPEL further invokes this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

### III. VENUE

17. Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

### IV. JURY DEMAND

18. Plaintiff ALEXANDER APPEL respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

### V. THE PARTIES

19. Plaintiff ALEXANDER APPEL is a resident of the City of Brooklyn, State of New York, and the County of Kings.

20. At all times relevant to the events the Plaintiff ALEXANDER APPEL was acting as a citizen journalist for Global Revolution TV, a live-stream video channel covering public speech and protest events.

21. Defendant CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

22. Defendant CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

23. That at all times hereinafter mentioned, Defendant POLICE OFFICERS "JOHN DOES 1-10" and Defendant SUPERIVSING POLICE OFFICERS "RICHARD ROES 1-10" (Collectively, "Defendant POLICE OFFICERS") were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

24. Plaintiff ALEXANDER APPEL will amend this complaint to name the Defendant "John Doe" POLICE OFFICERS and "Richard Roe" SUPERIVISING POLICE OFFICERS as their identities can be established to a reasonable certainty.

25. That at all times relevant to this action, the Defendant POLICE OFFICERS either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

26. Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope of their employment by Defendant CITY OF NEW YORK.

27. Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting in furtherance of their employment by Defendant CITY OF NEW YORK.

## VI. FACTS COMMON TO ALL CLAIMS

28. On the evening of October 5, 2011, at or around 7:00pm, Plaintiff ALEXANDER APPEL was present near the intersection of Bridge Street and State Street.

29. At all times relevant to the events described herein, Plaintiff ALEXANDER APPEL was present in the capacity of a citizen journalist.

30. At all times relevant to the events described herein, Plaintiff ALEXANDER APPEL was a "live-streamer" for Global Revolution TV, a group hosting a live-stream internet channel covering public protest and speech activities.

31. At the time of the incident, Global Revolution TV's coverage was heavily focused on Occupy Wall Street ("OWS") events.

32. Live-streaming describes the process of filming events and/or activities at one or more locations while concurrently allowing individual users/and or groups —— through the use of the internet —— to view those same events and/or activities from other locations in real time.

33. Live-streaming is a form of journalistic expression that has played an important role in furthering the OWS movement, in that it enables immediate and unfiltered coverage of OWS events, and official responses thereto, to reach significant numbers of individuals around the world.

34. As part of his work as a live-streamer, Plaintiff ALEXANDER APPEL was present during the Labor Rally that began in Foley Square, marched to Zuccotti Park and eventually continued to the intersection of Bridge and State Stree.  During this time period, he was documenting the march NYPD's response to a peaceful OWS demonstration.

35. Plaintiff ALEXANDER APPEL had been observing and documenting the demonstration in question for approximately one hour before the events giving rise to the incident in question began.

36. Over this same period of time, Plaintiff ALEXANDER APPEL observed multiple instances of police officers pushing, grabbing, shoving and otherwise manhandling OWS participants without apparent cause or justification.

37. At or around 7:00pm, Plaintiff ALEXANDER APPEL entered upon the sidewalk at or near the intersection of Bridge Street and State Street.

38. Plaintiff ALEXANDER APPEL was legally present on the sidewalk and complied with all orders issued by the NYPD.

39. Defendant JOHN DOE OFFICERS grabbed and tackled Plaintiff ALEXANDER APPEL to the ground without warning.

4

40. None of the Defendant POLICE OFFICERS present provided Plaintiff ALEXANDER APPEL with any type of warning or order before Defendant JOHN DOE OFFICERS tackled Plaintiff ALEXANDER APPEL to the ground.

41. One or more of the Defendant "John Doe" POLICE OFFICERS pinned Plaintiff ALEXANDER APPEL to the ground.

42. Having previously been a victim of police brutality, Plaintiff ALEXANDER APPEL quickly but calmly exclaimed, in sum and substance, "I AM NOT RESISTING. I AM NOT RESISTING."

43. Plaintiff ALEXANDER APPEL knew from his own past experience of police brutality, and from his observations as a live-stream journalist, that NYPD officers will shout "STOP RESISTING" while assaulting persons without cause, to create a pretext for their assault and for subsequent arrest of the assault victims.

44. After tackling Plaintiff ALEXANDER APPEL to the ground, Defendant JOHN DOE POLICE OFFICERS punched Plaintiff ALEXANDER APPEL in the face.

45. After punching Plaintiff ALEXANDER APPEL, Defendant JOHN DOE OFFICERS then exclaimed to Plaintiff ALEXANDER APPEL, in sum and substance, "STOP RESISTING!"

46. In response, Plaintiff ALEXANDER APPEL continued to state that he was not resisting

47. Plaintiff ALEXANDER APPEL had not resisted and was not resisting Defendant JOHN DOE POLICE OFFICERS' attack.

48. A Defendant JOHN DOE POLICE OFFICER then kicked Plaintiff ALEXANDER APPEL in the face.

49. The Defendant JOHN DOE POLICE OFFICER had no legitimate or cognizable reason for kicking Plaintiff ALEXANDER APPEL in the face.

50. At no point before, during, or after Defendant JOHN DOE POLICE OFFICER'S attack of Plaintiff ALEXANDER APPEL did any of the other Defendant POLICE OFFICERS attempt to stop, obstruct, or otherwise prevent the Defendant JOHN DOE POLICE OFFICER doing same.

51. Upon information and belief, at or around this time, Defendant SUPERVISING OFFICER RICHARD ROE directed Defendant JOHN DOE POLICE OFFICER to arrest Plaintiff ALEXANDER APPEL for violating PL §240.20(6), a Disorderly Conduct violation for intentionally obstructing vehicular or pedestrian traffic.

52. Plaintiff ALEXANDER APPEL had no intention to obstruct vehicular or pedestrian traffic, and had not done so before being seized by the Defendants.

53. On information and belief, the scrum of Defendant POLICE OFFICERS who seized and assaulted Plaintiff ALEXANDER APPEL may have caused an obstruction of pedestrian traffic.

54. A Defendant JOHN DOE POLICE OFFICER placed two sets of plastic flex cuffs around Plaintiff ALEXANDER APPEL's wrists, and tightened them so as to cut off Plaintiff ALEXANDER APPEL's blood circulation to his hands, and to cause bruises and abrasions to Plaintiff's wrists.

55. Plaintiff complained about the injuries to his hands and wrists, and a police officer cut off the two pairs of flex cuffs, and replaced them with a looser set.

56. Thereafter, one or more of the Defendant POLICE OFFICERS placed Plaintiff ALEXANDER APPEL in a nearby police van with other arrestees.

57. The Defendant POLICE OFFICERS then transported Plaintiff ALEXANDER APPEL to One Police Plaza.

58. Plaintiff ALEXANDER APPEL was then detailed for approximately seven hours.

59. The Defendants charged Plaintiff ALEXANDER APPEL with a single count of Disorderly Conduct, a violation and not a crime.

60. The Defendants issued the Plaintiff ALEXANDER APPEL a Desk Appearance Ticket.

61. Plaintiff ALEXANDER APPEL received an Adjournment in Contemplation of Dismissal in resolution of the violation charge against him.

62. As a result of the foregoing, Plaintiff ALEXANDER APPEL sustained, *inter alia,* physical injuries, mental injuries, emotional distress, embarrassment, humiliation, and deprivation of his constitutional rights.

63. As a result of the Defendants' constitutionally violative conduct, Plaintiff ALEXANDER APPEL demands a judgment from Defendants in a sum of money to be determined at trial.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

64. Plaintiff ALEXANDER APPEL repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

65. All of the aforementioned acts of the Defendant CITY OF NEW YORK, Defendant "John Doe" POLICE OFFICERS, ("Defendants", or "Defendant POLICE OFFICERS" unless otherwise described, henceforth), their agents, servants and employees, were carried out under the color of state law.

66.     All of the aforementioned acts deprived Plaintiff ALEXANDER APPEL of the rights, privileges and immunities guaranteed to citizens of the United States by the First, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

67.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

68.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

69.     The individual Defendants and Defendant CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

70.     As a result of the foregoing, Plaintiff ALEXANDER APPEL was put in fear for his safety; harassed, battered, berated, and caused to suffer significant and painful injuries to his face, wrists and hands.

71.     As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

72.     As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## SECOND CLAIM FOR RELIEF
## FALSE ARREST UNDER 42 U.S.C. § 1983

73.     Plaintiff ALEXANDER APPEL repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

74.     As a result of the aforesaid conduct by Defendants, Plaintiff ALEXANDER APPEL was subjected to an illegal, improper and false arrest by the Defendants and taken into custody and caused to be falsely imprisoned, detained and confined without any probable cause, privilege or consent.

75.     As a result of the above constitutionally impermissible conduct, Plaintiff ALEXANDER APPEL was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, legal expenses and damage to his reputation and standing within his community.

76.  As a result of Defendants' impermissible conduct, Plaintiff ALEXANDER APPEL demands judgment against Defendants in a sum of money to be determined at trial.

### THIRD CLAIM FOR RELIEF
### FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

77.  Plaintiff ALEXANDER APPEL repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

78.  The Defendants had an affirmative duty to intervene on Plaintiff ALEXANDER APPEL' behalf to prevent the violation of his constitutional rights.

79.  The individual Defendants failed to intervene on Plaintiff ALEXANDER APPEL' behalf to prevent the violation of his constitutional rights despite having had a realistic opportunity to do so.

80.  The individual Defendants failed to intervene on Plaintiff ALEXANDER APPEL 's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which Plaintiff ALEXANDER APPEL' rights were violated by their affirmative conduct.

81.  As a result of the aforementioned conduct of the individual Defendants, Plaintiff ALEXANDER APPEL' constitutional rights were violated.

82.  As a result of the above constitutionally impermissible conduct, Plaintiff ALEXANDER APPEL was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

83.  As a result of Defendants' impermissible conduct, Plaintiff ALEXANDER APPEL demands judgment against Defendants in a sum of money to be determined at trial.

### FOURTH CLAIM FOR RELIEF
### EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

84.  Plaintiff ALEXANDER APPEL repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

85.  Defendant JOHN DOE POLICE OFFICER used excessive force in tackling Plaintiff ALEXANDER APPEL to the ground.

86.  Defendant JOHN DOE POLICE OFFICER used excessive force in punching Plaintiff ALEXANDER APPEL.

87. Defendant JOHN DOE POLICE OFFICER used excessive force in kicking Plaintiff ALEXANDER APPEL.

88. Defendant JOHN DOE POLICE OFFICER and/or one or more of the Defendant "John Doe" POLICE OFFICERS used excessive force in handcuffing Plaintiff ALEXANDER APPEL in the absence of probable cause for his arrest.

89. The Defendants used excessive force against Plaintiff ALEXANDER APPEL in applying plastic flexcuffs so tightly to Plaintiffs' wrists that Plaintiff lost feeling in his wrist.

90. At no point during the above-mentioned actions did the circumstances presented to the Defendants support any of the above-mentioned applications of force on Plaintiff ALEXANDER APPEL.

91. Plaintiff ALEXANDER APPEL was subjected to excessive force in violation of his rights as guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

92. As a result of the above constitutionally impermissible conduct, Plaintiff ALEXANDER APPEL was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

93. As a result of Defendants' impermissible conduct, Plaintiff ALEXANDER APPEL demands judgment against Defendants in a sum of money to be determined at trial.

### FIFTH CLAIM FOR RELIEF
### MUNICIPAL LIABILITY UNDER *MONELL* ARISING FROM UNCONSTITUTIONAL POLICIES AND CUSTOMS UNDER 42 U.S.C. § 1983

94. Plaintiff ALEXANDER APPEL repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

95. Defendants harassed, battered, berated and caused Plaintiff ALEXANDER APPEL to suffer a significant and painful injury to his right wrist in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that their conduct would jeopardize Plaintiffs' liberty, well-being, safety and constitutional rights.

96. The acts complained of were carried out by the aforementioned individual defendant Police Officers in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

97. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New

York City Police Department, all under the supervision of ranking officers of said department.

98. The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

a) wrongfully arresting individuals without probable cause due to perceived lack of respect for the police (i.e., "contempt of cop" arrests);

b) wrongfully arresting individuals without probable cause in attempts to justify excessive uses of force (i.e. "cover charge" arrests);

c) wrongfully arresting and brutalizing individuals without probable cause to punish individuals for attempting to document enforcement actions (i.e., "contempt of cop" arrests in violation of the June 1, 1977 consent decree entered into by Defendant City of New York in Black v. Codd, SDNY 73 Civ. 5283);

d) wrongfully arresting innocent persons in order to meet quantitative "productivity goals" (i.e., arrest quotas); and

e) wrongfully arresting and assaulting persons in order to chill First Amendment rights to protest.

99. Upon information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against persons engaged in the practice of exercising their First Amendment Protected rights to free speech and association.

100. Upon information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against person specifically engaged in the practice of exercising their First Amendment Protected rights to free speech and association while participating in or observing assemblies, marches, and events related to Occupy Wall Street.

101. In January 2012, the concentrated and collaborative efforts of seven law school clinics throughout the United States founded the *Protests and Assembly Rights Project* in order to "Investigate… the United States' response to Occupy Wall Street in light of the government's international legal obligations."[1]

102. These same concentrated and collaborative efforts helped the *Protests and Assembly Rights Project* draft and thereafter, in July of 2012, publish, "Suppressing Protest: Human Rights Violations In The U.S. Response To Occupy Wall Street" ("The Report"); wherein, the authors state, "In many instances, the… [NYPD] have responded aggressively to nonviolent protests, and have escalated situations —— through arbitrary or misapplications of the law, an excessive police presence, or the use of unwarranted force.

---

[1] Sarah Knuckley et al., "Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street" (2012). Report incorporated by reference herein and available online at:
http://chrgj.org/documents/suppressing-protest-human-rights-violations-in-the-u-s-response-to-occupy-wall-street/

The police response has thus . . . undermined basic assembly and expression freedoms [and] [a]t times . . . presented a threat to the safety of New Yorkers." See fn4 at [internal pagination] 71.

103. In efforts to explain and/or identify the source of the NYPD's "aggressive responses to nonviolent protests", The Report calls attention to the fact that, "in recent years, New York City has witnessed a shift from 'reactive' policing to 'proactive' policing under Commissioner Raymond Kelly's 'Safe Streets, Safe City' initiative…. [meaning] that police adopt measures in advance to minimize the potential impact and size of a protest, which might include preparing a large police force to arrive at a scheduled protest location before the event begins, or regulating permits for the protest in a manner designed to redirect the protest." See fn1 at [internal pagination] 30 (internal citations omitted).

104. Despite the positive implications in the title of Commissioner Kelly's 'Safe Streets, Safe City' initiative, this 'proactive' form of policing has failed to keep OWS protesters, observers, and bystanders alike safer, but instead, has led to repeated and continuing acts of police officers committing "clear violations of the government's obligation to uphold assembly and expression rights…. [amounting together to] protest suppression[.]" See fn1 at [internal pagination] 71.

105. Further, The Report cites several instances of "Overpolicing and Poor Communication" conducted by the NYPD, where generally "[a]t times, the number of officers on hand [at OWS assemblies, marches, and events] has rivaled or even exceeded the number of protestors . . . repeatedly, the number of visible police [has been] manifestly excessive in comparison to both the peaceful nature of the assembly and the number in attendance at the protests." to wit; "[o]casionally, officers in visibly threatening "hard" uniform (e.g.. body padding, helmets, shields) have attended protests, including small protests posing no evident threat." See fn1 at 82.

106. Witnesses have observed NYPD officers who have been assigned to perform crowd control duties and overall help provide for individuals' safety instead strike, beat, and otherwise berate civilians without reason, without notice, and without consequence; to wit, "One protestor . . . reported being punched in the left temple by an officer, without any apparent provocation or notice [and thereafter] [t]he punch led to swelling, bleeding, bruising, dizzy spells, and nausea [which required] the individual [to seek] emergency medical treatment[,]" further, "[one legal observer who was also a retired New York Supreme Court judge] . . . witnessed an officer throw a woman to the ground 'out of nowhere' and hit her in the head[,]" and still further, "[one video from an OWS event] shows that an officer approached a woman from behind and grabbed her by the strap of her backpack and her scarf for no apparent reason[;] the officer [then] began to pull the woman towards him . . . for approximately fifteen seconds, and appeared to possibly be choking her via the strap of her scarf [and after this incident] the police appeared not to take any action [against the officer]." See fn1 at 73, 74, and "Appendix I[:] Table of Alleged Police Use of Force Incidents."

107. The Report posits how, following incidents of police brutality such as these, the conduct of the NYPD in response to OWS assemblies, marches, and events has and

11

continues to cause "[p]rotestors [to] reasonably perceive that they cannot safely protest [and thus remain] constantly on guard for potential arbitrary police force, or decide to leave the assembly[,]"; and as a result OWS participants, observers, and bystanders and civilians generally "view a[n] NYPD officer as someone who can take out [his] baton and beat [an individual] and face no repercussion." See fn1 at 81.

108. Or further, stated differently by a graduate student who had attended multiple OWS events before and leading up to The Report's publication, "'It's a shock when you expect police to protect you, but you see them beat people . . . [I] grew up thinking that the cops are 'the good guys' but . . . when you see them beat people for no reason, it changes your world. You don't feel safe." See fn1 at 82.

109. Plaintiff ALEXANDER APPEL did not feel safe on the evening of the incident.

110. In suggesting positive changes that the NYPD should employ to effectively curb and prevent its officers from engaging in repeated, continuing and widespread acts of excessive force in response to OWS assemblies, marches, and events specifically and individuals' exercising of their First Amendment protected rights generally, The Report states, "[Government agencies] have an international legal obligation to investigate, prosecute, and remedy human rights violations[;] [t]his obligation requires [government agencies] to have in place systems that enable individuals to have 'accessible and effective remedies' to vindicate their rights . . . [t]he obligation to investigate and punish violations 'requires that not only the direct perpetrators of human rights violations be punished.'" See fn1 at 68.

111. Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department engaging in excessive force in order to effectively chill OWS participants', observers', and bystanders' specific as well as individuals' general exercise of their First Amendment protected rights to free speech, expression, and association, but has failed to take action to remedy the problem.

112. Upon information and belief, Defendant CITY OF NEW YORK continues to resist collection and disclosure of data concerning the prevalence of police brutality utilized in order to effectively chill civilians' exercise of their First Amendment protected rights, instead choosing to conceal the problem from the public in order to continue its policy of acquiescence in such practices without fear of public or political backlash.

113. Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit shortcomings and deficiencies in the New York City Police Departments' recruitment, training, and management practices that allow the continuation of the practice and custom of NYPD officers' use of excessive force and police brutality in order to effectively chill civilians' exercise of their First Amendment protected rights.

114. Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit flawed and/or deficient systems of reporting, oversight, and accountability that allow the continuation of the practice and custom of NYPD officers'

use of excessive force and police brutality in order to effectively chill civilians' exercise of their First Amendment protected rights.

115. Defendant CITY OF NEW YORK's knowledge and condonation of the continuing customs and practices that caused Plaintiff's injury precede the inception of the OWS movement, and have been repeated and clear for nearly twenty (20) years.

116. On July 7, 1994, a blue ribbon panel led by Hon. J. Milton Mollen ("The Mollen Commission") presented the report of its nearly two-year investigation into allegations of NYPD corruption, undertaken in 1992 at the behest of then-Mayor David Dinkins ("The Mollen Commission Report," "The Report").[2]

117. The Mollen Commission Report was subtitled "ANATOMY OF FAILURE: A PATH FOR SUCCESS." The Report at page before "i."

118. The July 7, 1994 Mollen Commission Report was prepared for and at the request of the Defendant City of New York, and therefore knowledge of its contents may be imputed to Defendant City of New York.

119. The Mollen Commission Report found that police officers commonly covered up their fellow officers' misconduct, including but not limited to excessive applications of force against civilians, in accordance with a custom or practice known as a "code of silence" or "Blue Wall of Silence.

120. The above-referred custom or practice of members of the New York City Police Department known as the "Blue Wall of Silence" was discussed at length on pages 53-59 of the July 7, 1994 Mollen Commission Report.

121. One police officer who testified before the Mollen Commission explained that the code of silence "…starts in the Police Academy, and it just develops from there…. It starts with the instructors telling you never to be a rat, never give up your fellow officer. It starts with other recruits telling you they'll never give you up, and it just goes down the line as you go… into a precinct." The Report at 55.

122. Another officer who testified before the Mollen Commission stated that "[c]ops don't tell on cops. And if they did tell on them, just say if a cop decided to tell on me, his career's ruined. He's going to be labeled as a rat…. he's going to have nobody to work with. And chances are if it comes down to it… [the whistleblower's fellow officers are] going to let him get hurt." The Report at 53-54.

---

[2] Mollen, Baer, Evans, Lankler, Tyler, Armao, Cornfeld, "The City of New York Commission to Investigate Allegations of Police Corruption and The Anti-Corruption Procedures of The Police Department Commission Report," July 7, 1994, City of New York. Incorporated by reference herein and available online at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf .

123. A third officer who testified before the Mollen Commission concurred, stating: "[i]f you're labeled a rat… you're going to have a difficult time for the remainder of your career…. [i]t was something that you couldn't shake." Id. at 54.

124. An NYPD lieutenant who testified before the Mollen Commission confirmed that officers are at times "ostracized" for breaking the code of silence. Id.

125. An NYPD captain who disciplined his subordinates for misconduct and reported allegations of corruption to NYPD Internal Affairs explained to the Mollen Commission that he had been transferred to thirty-eight (38) different commands in the course of his career, and in almost every case "he found evidence that his reputation had preceded him. At one command, his locker was burned; at another, his car tires were slashed; at another, he received threats of physical harm." Id.

126. The Mollen Commission Report explicitly identified police brutality, including "implicit or explicit threat[s] of physical harm[,]" and official tolerance thereof, as critical issues that must be investigated by "any Commission investigating police corruption." Id. at 44.

127. The Mollen Commission went on to fault the NYPD's intelligence gathering regarding incidents of brutality as "wholly inadequate." Id. at 45.

128. The Mollen Commission found that "[police b]rutality is… used as a rite of initiation to prove that an officer is a tough or 'good' cop, one who can be accepted and trusted by his fellow officers not to report wrongdoing." Id. at 47.

129. One officer who testified before the Mollen Commission noted that brutality "is a form of acceptance. It's not simply giving a beating. It's the other officers begin [sic] to accept you more." Id.

130. The Mollen Commission also found that NYPD "supervisors sometimes turn a blind eye to evidence of unnecessary violence…. [b]ecause a complaint usually comes down to an officer's word (and often the word of fellow officer witnesses) against the… [complainant's] word, it is easy for a supervisor to let clear acts of brutality slide by without recourse." The Report at 49.

131. As of the July 7, 1994 Mollen Commission Report, Defendant City of New York had notice that the officers and commanders of the New York City Police Department tolerated and encouraged police to lie to cover up the wrongful conduct of themselves and their fellow officers, including brutal conduct like that which was perpetrated by Defendant POLICE OFFICERS upon Plaintiff.

132. On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the custom or practice of officers employing excessive force against civilians.

133.   On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the enabling custom or practice of officers actively or passively covering up other officers' misconduct, including but not limited to employing excessive force against civilians.

134.   The failure of Defendant CITY OF NEW YORK to meaningfully address these issues was underscored when the non-governmental organization Human Rights Watch conducted a study examining common obstacles to accountability for police abuse in fourteen large cities, including Atlanta, Boston, Chicago, Detroit, Indianapolis, Los Angeles, Minneapolis, New Orleans, New York, Philadelphia, Portland, Providence, San Francisco, and Washington, D.C.[3]

135.   Research for this report was conducted over two and a half years, from late 1995 through early 1998.  See fn3.

136.   The report stated: "The barriers to accountability are remarkably similar from city to city. Shortcomings in recruitment, training, and management are common to all. So is the fact that officers who repeatedly commit human rights violations tend to be a small minority who taint entire police departments but are protected, routinely, by the silence of their fellow officers and by flawed systems of reporting, oversight, and accountability. Another pervasive shortcoming is the scarcity of meaningful information about trends in abuse; data are also lacking regarding the police departments' response to those incidents and their plans or actions to prevent brutality. Where data do exist, there is no evidence that police administrators or, where relevant, prosecutors, utilize available information in a way to deter abuse." See Id.

137.   The report documented that the official response of the New York City Police Department and the City of New York, to credible, persistent reports of abuse was to deny the existence of the problem. See Id.

138.   The report documented that the New York City Police Department, and the City of New York failed to discipline officers in all but 1% of incidents in which complaints were filed with the Civilian Complaint Review Board. See Id.

139.   Upon information and belief, the report was presented to Mayor Rudy Giuliani of the City of New York.

140.   Upon information and belief, the Mayor denounced the report without reading it.

141.   Upon information and belief, Kenneth Roth, then Executive Director Human Rights Watch wrote in an open letter to the Mayor on July 14, 1998: "Rather than engage in a serious discussion of the problem of police brutality in New York City, you attacked

---

[3] "Shielded from Justice: Police Brutality and Accountability in the United States," Human Rights Watch, June 1998.  Report incorporated by reference herein and available online at http://www.columbia.edu/itc/journalism/cases/katrina/Human%20Rights%20Watch/uspohtml/toc.htm.

those who raised the issue -- apparently without even reading the advance copy of the report we had sent you."

142.  Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department engaging in excessive force, but has failed to take action to remedy the problem.

143.  That the Defendant City of New York continued to have notice after 1994 that the officers and commanders of the New York City Police Department continued to tolerate and encourage police to lie to cover up the wrongful conduct of themselves and their fellow officers after the publication of the Mollen Commission Report can be shown with reference to the following cases:

   a. **Ariza v. City of New York**, 1996 U.S. Dist. LEXIS 20250, 14 (E.D.N.Y. March 7, 1996) ["The [municipal] defendants concede, however, that the code exists to prevent other officers from reporting corruption or dishonesty by fellow officers…. [t]he principle behind the 'blue wall of silence' is that officers will suffer recrimination for breaking ranks and subjecting police conduct to public scrutiny."]

   b. **White-Ruiz v. City of New York**, 1996 U.S. Dist. LEXIS 15571, 23 (S.D.N.Y. October 21, 1996)  ["[P]laintiff offers sufficient evidence to permit a reasonable trier of fact to infer that the 'blue wall of silence' constitutes a custom or usage of the Department"]

   c. **United States v. Rosario**, 237 F. Supp. 2d 242, 248 (E.D.N.Y. 2002) ["[Assistant U.S. Attorney] Palmer testified that while supervising the federal investigation into the Louima assault, she routinely confronted a 'blue wall of silence' erected by police officers and PBA officials intent on obstructing efforts to uncover the full truth about what had happened at the 70th precinct on August 9, 1997."]

   d. **Barry v. New York City Police Dep't**, 2004 U.S. Dist. LEXIS 5951, 40-41 (S.D.N.Y. April 7, 2004) ["[P]laintiff's witnesses speak from firsthand experience about the blue wall of silence…. Plaintiff complains of acts that are of the precise nature as the customs and practices described in the [Mollen Commission] Report."

   e. **Griffin v. City of New York et al.**, 10-CV-01824 (E.D.N.Y. 2010) [Plaintiff detective sues on pattern of retaliation following his reporting fellow detective to Internal Affairs, fellow officers cover for detective accused of misconduct, see, e.g., at ¶35: "Internal Affairs conducted its investigation into [Detective] Plaintiff's allegations [of misconduct] against [Detective] McCarthy. All of the material witnesses failed to cooperate with the investigation by being less than truthful…. [a]s a result,

>the allegations made by Plaintiff against McCarthy were dismissed as unsubstantiated."]

144. Upon information and belief, the above-referred constitutionally violative policies, practices and customs remain widespread, open, and notorious throughout the NYPD to date.

145. Upon information and belief, the policymakers of the NYPD and Defendant City of New York are aware that these practices and customs of NYPD officers continue to date, and have failed to take adequate steps to curb these practices and customs, which regularly cause the violation of citizens Constitutional rights.

146. Defendant City of New York has failed to meaningfully curb these Constitutionally-violative customs and practices to date.

147. In the introduction to the Mollen Commission Report, it is noted that "the [Internal Affairs] system designed to protect the [New York City Police] Department from corruption minimized the likelihood of uncovering it." The Report at 3.

148. The Mollen Commission Report explained that at that time, the Internal Affairs Division (re-named the Internal Affairs Bureau in a 1993 restructuring) attempted "to close cases with as little effort as possible…. One officer told us they sit around and 'eat donuts and do crossword puzzles' -- and the supervisors and commanders did little more…. an anonymous survey of the work conditions and attitudes of IAD investigators… revealed that almost half of IAD investigators' time was spent on non-investigatory matters -- and more of their 'investigative' work was done without ever leaving their office…. The facts confirmed IAD's do-nothing reputation." The Report at 85

149. Since the Mollen Commission Report was published in 1994, the number of complaints of police corruption and other misconduct logged annually by NYPD Internal Affairs has nearly quadrupled, rising from 14,789 logs received in 1994 to 44,994 logs received in 2006, the last year for which NYPD reporting is available. *NYPD Internal Affairs 2006 Annual Report*, 12-13.[4]

150. Over that same time period, the number of corruption and other police misconduct complaints investigated annually by NYPD Internal Affairs has fallen by more than half, from 2,258 investigations in 1994 to 1057 investigations in 2006. *Id*.

151. More up-to-date information relating to these customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department

---

[4] 1993-2006 Internal Affairs Reports available online at
http://www.nyclu.org/news/nyclu-releases-16-years-of-nypd-corruption-reports.

is available in "THE PRICE OF BRUTALITY: A special report.; Police Complaints Settled, Rarely Resolved." *The New York Times*, September 17, 1997.[5]

152.   Upon information and belief, the steady decline in investigations by NYPD Internal Affairs since the publication of the Mollen Commission Report is representative of a return to a "business-as-usual" mentality with respect to police corruption and brutality within the NYPD.

153.   Defendant City of New York has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively fulfilling its mandate of policing NYPD corruption and brutality generally.

154.   Upon information and belief, Defendant City of New York has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively curbing the established and widespread customs and practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

155.   Defendant City of New York has also had notice that the New York City Civilian Complaint Review Board ("CCRB") has not been effective in curbing the above-referred practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

156.   As a result of the aforementioned conduct of the Defendant CITY OF NEW YORK and the individual Defendant Police Officers, Plaintiff ALEXANDER APPEL's constitutional rights were violated.

157.   As a result of the above constitutionally impermissible conduct, Plaintiff ALEXANDER APPEL was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

158.   As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### RETALIATION FOR FIRST AMENDMENT PROTECTED EXPRESSION
### UNDER 42 U.S.C. § 1983

159.   Plaintiff ALEXANDER APPEL repeats, reiterates and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

---

[5] Sontag, Deborah & Barry, Dan, *The New York Times*, Sept. 17, 1997 available online at http://www.nytimes.com/1997/09/17/nyregion/price-brutality-special-report-police-complaints-settled-rarely-resolved.html?pagewanted=all&src=pm.

160.  Plaintiff ALEXANDER APPEL was present as a journalist observing an OWS event, and police responses thereto, at the time of the incident in question.

161.  The Defendant POLICE OFFICERS tackled and struck and arrested Plaintiff ALEXANDER APPEL in order to retaliate against Plaintiff ALEXANDER APPEL for being present as a journalist covering an OWS event, and police responses thereto.

162.  Plaintiff ALEXANDER APPEL was not engaged in any illegal activity of any kind or sort when the Defendant POLICE OFFICERS tackled and struck and arrested Plaintiff ALEXANDER APPEL.

163.  The Defendant "John Doe" POLICE OFFICERS utilized excessive force against Plaintiff ALEXANDER APPEL in order to retaliate against him for lawfully exercising his First Amendment protected rights to free speech, expression, and association.

164.  The actions of the Defendant "John Doe" POLICE OFFICERS heretofore described, were designed to and did cause bodily harm, pain and suffering in direct retaliation for Plaintiff ALEXANDER APPEL's exercise of his civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

165.  As a result of the foregoing, Plaintiff ALEXANDER APPEL is entitled to compensatory damages and punitive damages against the Defendants in amounts to be determined at trial.

166.  As a result of the above constitutionally impermissible conduct, Plaintiff ALEXANDER APPEL was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

167.  As a result of Defendants' impermissible conduct, Plaintiff ALEXANDER APPEL demands judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the interest of justice.


DATED:    New York, New York
          October 1, 2014

                           Respectfully submitted,


                           _____
                           WYLIE M. STECKLOW [WS 6012]
                           STECKLOW COHEN & THOMPSON
                           217 Centre Street – 6th Floor
                           New York, New York 10012
                           [212] 566-8000
                           [212] 202-4952/FAX
                           Info@WYLIELAW.COM
                           ATTORNEYS FOR PLAINTIFF